## MOULTON v. STATE.

No. A-11275.   Feb. 7, 1951.

(227 P. 2d 695.)

Irvine E. Ungerman and Chas. A. Whitebook, Tulsa, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

POWELL, J. The plaintiff in error, Bill Moulton, who will hereinafter be referred to as defendant, was charged by information filed in the court of common pleas of Tulsa county with the crime of unlawful possession of intoxicating liquor. Counsel for defendant duly filed a motion to suppress evidence, and said motion being overruled after evidence was heard, counsel for the defendant and for the state thereafter stipulated that the evidence heard on the motion might be considered by the court as evidence in the case in chief on trial. And the court having heard additional evidence on trial, at conclusion, found the defendant guilty as charged and assessed his punishment at 30 days imprisonment, and to pay a fine of $300, and appeal has been duly perfected to this court.

A number of alleged errors are set out in the petition in error, but the gist of the complaint, and the proposition earnestly and ably urged and argued in brief, is that:

"The judgment and sentence of the trial court rests wholly upon incompetent and inadmissible evidence obtained as a result of an illegal search and seizure."

The evidence developed that the sheriff of Tulsa county had procured a search warrant for the northeast

room of the second floor of a building located at 216½ South Boston street, Tulsa. The sheriff and several deputies went to the building, two officers going to the back alley and Sheriff Blaine and Deputy Rains going upstairs to the room for which they had a warrant to search. The door was found to be locked, and Rains proceeded to look for a key and found a door unlocked across the hall, and apparently tried the door and without knocking or invitation, walked into a room approximately 15 by 30 feet. The sheriff followed, and Deputies Oakes and Prince came on upstairs shortly, and all seem to have entered the door to the south half of the upstairs, where a "lot of people were congregated" playing cards. The officers had no warrant for the search of the south room. Sheriff Blaine on direct examination testified:

"Q. Will you please explain to the court under what circumstances you were there [in the south room]; describe what you did? A. We were standing in there in the regular routine of a raid, and I had placed Mr. Oakes at the door; after we had been in there quite a few minutes why I noticed Oakes turn around and open the door. Just as he did I saw the corner of a box come in, and then recognized, seen Bill. Oakes just took the whisky out of his hands and made some remark, I don't know what it was exactly, and handed it to me, and I set it down on the table and turned around and shook Bill down and took a pistol off of him. Q. Placed him under arrest? A. Yes. Q. That was after you called him? A. Yes, sir. Q. When you saw this box did you see the whisky inside of it? A. As soon as he opened the door I saw it. I didn't until the door opened. Q. Did you see what was in the box? A. Yes, sir. Q. What did you see inside the box? A. Whisky. Q. When you first saw it where was Bill, inside or outside of the door? A. He was just coming through the door when I seen it."

Not having a search warrant for the room being searched, unless the sheriff was justified under some provi-

sion of law in making such search without a warrant, the evidence obtained by the way of whisky brought into the room by the defendant would not be admissible in evidence against defendant. And it would be immaterial whether the officers could see the whisky in the box held by defendant prior to handing the box to the deputy or after disengagement from his bosom and arms. If the officers were illegally in this room, which the evidence developed was leased by the defendant, there would be no way to justify them in offering in evidence the liquor even if it had been in open sight when officer Rains entered the room. Tucker v. State, 62 Okla. Cr. 406, 71 P. 2d 1092; Edwards v. State, 83 Okla. Cr. 340, 177 P. 2d 143; Hoppes v. State, 70 Okla. Cr. 179, 105 P. 2d 433; Flowers v. State, 88 Okla. Cr. 252, 202 P. 2d 233; McDonald v. United States, 335 U.S. 451, 69 S. Ct. 191, 93 L. Ed. 153; Jones v. State, 88 Okla. Cr. 243, 202 P. 2d 228; United States v. Di Re, 332 U.S. 581, 68 S. Ct. 222, 92 L. Ed. 210

So, then, the vital inquiry centers around the right of the officers to enter plaintiff's south room in the first instance. If this room was defendant's home and not a place of business or place where the general public was welcome to come, the officers could not enter without invitation from the occupant, and no invitation was shown.

Deputy Sheriff Rains, on cross-examination, testified:

"Q. The fact of the matter is you and the sheriff, Oakes and a few other deputies went up to make a raid in the room located and described as the northeast room of that building? A. Yes, sir. Q. You couldn't get into that room? A. No. Q. And you went across the hall in the other room? A. I was searching for somebody to

open the door for me; I opened that door and went in there and found all these people there."

This would indicate that Rains entered the room not for the purpose of search but merely for inquiry. Still, if this was a private home or club, that would not justify the entrance without invitation or a search warrant.

The next inquiry, then, is whether or not this was a place of business or place where the public was welcome. In that connection, the testimony of the defendant is most pertinent. He testified that he had leased the premises in question some 30 days previously, and for a term of twelve months; that there was a small back room and one large room about 30 by 15 feet; that there were two doors, one being kept locked at all times and the other door was never locked, but the door was kept closed. He further testified that he was not conducting a business in his room, but admitted that card playing was permitted, stating that it was a sort of club, that members of the public were invited and that most any person could get in. Witness was not asked and did not explain just how members of the public were invited, and there was no evidence to indicate that there was an implied invitation to all members of the public.

Conclusively this was not a residence, and there were 23 or 24 persons in the room playing cards,—too many under ordinary circumstances to merely be the guests of the defendant. Rather, as witness stated, this was a club where most any person who wanted to could get in. But the evidence fails to show that admittance was without any restriction, and that the public generally was invited. Did the facts developed justify Deputy Rains' entrance to make inquiry for someone with the means and author-

ity to open the door to the northeast room just across the hall, and for which he had a warrant to search?

As stated, we cannot overlook the fact that Officer Rains did not knock, that he was not invited in by anyone, much less the person in charge, and the door being at all times closed, he did not see what was going on in the room until he opened the door; he did not enter because of a disturbance or cry for help or because of any positive knowledge of law violation coming to him directly through his five senses, and he did not enter the room because he thought that it was a place of business. He was asked on cross-examination:

"Q. There wasn't any sign there inviting you in, was there, Roy? A. I didn't see any signs on the door at all."

Apparently the officers immediately commenced raiding the place on discovery that there were a large number of men congregated in the room in question.

While it is evident that the defendant was operating a gambling room (one of the guests, W. R. Abel, having admitted on cross-examination, "Well, I was just up there with the boys gambling") and was in the act of furnishing liquor to his guests, there is not sufficient evidence in the record to show that the room in question was a place of business or a public place in the sense that the general public was invited to enter, and that would justify the officers in entering without a search warrant. This is a close question, it is true, in view of the testimony of the defendant, who while denying that he was carrying on a business did admit that it was not difficult to enter his club. But he was not asked by the county attorney, and did not admit, that there were no restrictions as to admittance.

This court must consider the fact that the officers did have a search warrant to search the room just across the hall from defendant's place, and that a necessary prerequisite to obtaining a search warrant is an affidavit from someone setting forth facts tending to establish the grounds of the application. Tit. 22 O.S.A. §§ 1221-1225; Tit. 37 O.S.A. § 84. The affidavit and search warrant were not included in the case-made filed herein, but the record and briefs of the parties do show that the officers were searching for intoxicating liquors. Without doubt the officers on finding the door to the northeast room locked and the place quiet were bound to have heard the 23 or 24 men across the hall, and are bound to have realized their mistake, as contended by counsel for defendant. The raid followed. The sheriff so says. But assemblage alone would not justify the raid. Deputy Rains would justify his entrance in the defendant's place by the statement that he was looking for someone to let him in the northeast room. No doubt he was seeking entrance to that room, but that idea seems to have been abandoned when he heard the noise across the hall. No facts were developed that would justify the entrance by the officers by reason of anything they heard. There is no evidence that the northeast room was ever searched. Section 30, Article II of the Constitution of the State of Oklahoma, reads:

"The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches or seizures shall not be violated; and no warrant shall issue but upon probable cause supported by oath or affirmation, describing as particularly as may be the place to be searched and the person or thing to be seized."

The officers should have obtained a new search warrant. If they had remained in the hall, where they had a right to be, and the defendant had appeared with the

whisky in an open box and they had seen it, then by provision of Tit. 37 O.S.A. § 89; Okla. Const. Article II, Section 7, the officers would have had the right to have arrested the defendant without a warrant. Greer v. State, 88 Okla. Cr. 195, 201 P. 2d 274.

There is a vast difference between this case and such cases as Green v. State, supra, where the defendant operated the Skyline Club where there was a big neon sign that could be seen from the highway and where food was served, and which club was open to the public for eating and dancing. Nor is it like the case of Phinney v. State, 90 Okla. Cr. 21, 210 P. 2d 205, involving the 66 Club. In these cases the terms "Skyline Club" and "66 Club" were merely trade names, and the general public was catered to. The within case is more like the recent case of Walker v. State, 92 Okla. Cr. 247, 222 P. 2d 766, where there was involved the search of a club room operated in the New Orient Hotel, Altus. There the officers had a search warrant, but served the same after the search and on the wrong person. The case was reversed.

It is important to realize that there is involved a provision of our State Constitution rather than a rule of evidence or a statute dealing with procedure. The framers of our Constitution justified this enactment, no doubt, because they were bound to have been conscious of the sacredness and sanctity of the home, and of the prevailing belief that the success of a democracy depended in great part upon a citizenship home conscious and as a consequence more likely to be permeated with those stable qualities necessary to sustain the nation through its trials and tribulations. There is a solid foundation for the provision. But in any event, it is the sworn

duty of the members of this court to uphold the Constitution, and this means that we must conscientiously apply the law to the facts developed in a particular case, and evidence obtained in violation of this constitutional provision must be rejected.

Having concluded that the search of the south room was not justified without a search warrant, the discovery thereafter of certain flasks of whisky in a cardboard milk-box in the arms of the defendant was incident to an unlawful search and not independent of and precedent to the search, and the question of whether or not the officers could or could not see the whisky in the container prior to seizure is not material. See the cases first herein cited.

The officers apparently doubted their authority to make the raid as the record reflects the fact that although the raid was conducted on the night of April 2, 1949, a warrant for the arrest of defendant was not issued until April 5, 1949. If the defendant had been arrested at the time of the raid for commission of a misdemeanor in the presence of the officers, it would not have been necessary to have issued another warrant, which Deputy Rains swears he executed on April 5, 1949.

The case is reversed and it is ordered that the defendant be discharged.

BRETT, P. J., and JONES, J., concur.